IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RICHARD R. SISNEY, JR., FRANK FETTERS and RYAN WALKER, On Behalf of Themselves and All Others Similarly Situated,<br>　　Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. 5:15-cv-132-OLG |
| | § | |
| TRINIDAD DRILLING, LP,<br>　　Defendant. | §<br>§<br>§ | |

## TRINIDAD DRILLING, LP'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Defendant Trinidad Drilling, LP ("Trinidad"), and file this Motion for Summary Judgment, and would respectfully show the following:

### I. INTRODUCTION

1. Plaintiffs Richard R. Sisney, Jr., Frank Fetters and Ryan Walker are former Trinidad employees who allege that they, and other former employees, did not receive notice of their layoffs under the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §§ 2101-2109, *et seq.* (the "WARN Act"). Because none of the Plaintiffs worked at single site of employment where 50 or more employees were laid off, no WARN Act notices were required.

### II. STATEMENT OF MATERIAL FACTS

2. Trinidad owns and operates drilling rigs ("Rigs") which are used to provide drilling services for customers that own oil and gas leases and/or drilling rights in various states, including Oklahoma and Texas. *See* Affidavit of Carlton Campbell, attached hereto as Exhibit A, ¶ 3.

1

3. Each Rig is managed by a Rig Manager (a/k/a Tool Pusher), who directly supervises and assigns work to a complement of subordinate employees that includes Drillers, Derrickhands, Motorhands and Floorhands. *Id.* at ¶ 4. In the absence of the Rig Manager, the Driller manages the Rig, and directly supervises and provides work assignments to the Derrickhands, Motorhands and Floorhands. *Id.*

4. Each Rig is treated as a separate cost/profit center, and maintains its own dedicated equipment and supplies. *Id.* at ¶ 5. Equipment and supplies are not borrowed or shared between Rigs. *Id.* Rather, each Rig Manager monitors and replenishes, as needed, the Rig's equipment and supplies by directly ordering what is needed from a third party vendor, and then paying the vendor with a company credit card that is provided to the Rig Manager to use for that purpose. *Id.* Among other things, each Rig calculates and pays its own ad valorem and other taxes. *Id.*

5. Employees assigned to a Rig are divided into two shifts, with each shift divided into a day crew and a night crew. *Id.* at ¶ 6. Thus, there are 4 crews assigned to each Rig. *Id.* The employees on each shift work a rotating schedule of 14 days on duty, followed by 14 days off duty. *Id.* Within each shift, the employees on each crew work a rotating schedule of 12 hours on duty followed by 12 hours off duty. *Id.*

6. Depending upon several factors, the total complement of employees assigned to, and working on, a Rig can vary from as few as 13 to as many as 26. *Id.* at ¶ 7. These numbers include both crews on both shifts. *Id.* In no instances does a Rig have as many as 50 employees assigned to it. *Id.*

7. Employees are permanently assigned to specific Rigs, and are not shared or borrowed between Rigs. *Id.* at ¶ 8. However, employees can be reassigned from one Rig to

another Rig in two circumstances. *Id.* First, if an employee is promoted to a higher position, and there is not an opening for that position on his assigned Rig, but there is an opening for that position on another Rig, the employee is allowed to transfer to the Rig that has the opening. *Id.* Second, if a Rig loses an employee, and cannot fill that position from the existing crews assigned to that Rig, or by hiring a new employee, and there is an employee on another Rig who is both capable of performing the position and can be replaced on his current Rig, the employee may be transferred to the Rig that has an opening. *Id.* In both instances, the employee is permanently reassigned to the Rig that has the opening; not borrowed from or shared with the Rig to which he was previously assigned. *Id.*

8. Each of the Plaintiffs in this Lawsuit is now a former employee of Trinidad who was previously assigned to a specific Rig. *Id.* at ¶ 9. In particular:

> (a) Mr. Sisney was assigned to and worked on Rig 123 from the commencement of his employment on or about September 10, 2013 until he was laid off on or about December 19, 2014. He worked as a Floorhand on the day crew, and he was supervised and directed by Rig Manager Christopher Scott Williams and Driller Gregory Stephenson. Including Mr. Sisney, a total of 32 employees worked on Rig 123. *Id.*
> 
> (b) Mr. Fetters was assigned to and worked on Rig 206 from the commencement of his employment on or about November 21, 2014 until he was laid off on or about January 2, 2015. He worked as a Driller on the day crew, and he was supervised and directed by Rig Manager Conrad Cody Brown. Including Mr. Fetters, a total of 22 employees worked on Rig 206. *Id.*
> 
> (c) Mr. Walker was assigned to and worked on Rig 111 from the commencement of his employment on or about August 29, 2014 until he was laid off on or about January 13, 2015. He worked as a Motorhand on the day crew, and he was supervised and directed by Rig Manager Robin Gould and Driller Hector Chaparro. Including Mr. Walker, a total of 22 employees worked on Rig 111. *Id.*

9. When in service, each Rig is physically moved to and assembled on the site where drilling services are to be provided. *Id.* at ¶ 11. Depending upon the nature of the services to be provided, the Rig will remain on that location for as little as 1 week to as long as 12 weeks. *Id.* Once a job is completed, the Rig is disassembled and physically moved to and reassembled on the next site where drilling services are to be provided. *Id.* If no work is available for a Rig, then the Rig is taken out of service, and physically moved to and stored at a secure location, and the employees assigned to that Rig are laid off. *Id.*

10. In the Summer and Fall of 2014, there was sufficient demand for Trinidad's drilling services to keep all of its roughly 50 Rigs busy with work. *Id.* at ¶ 12. However, by December of 2014, a drop in oil prices had caused a corresponding drop in the demand for Trinidad's drilling services, and Trinidad did not have enough work to keep all of its Rigs in use. *Id.* Thus, Trinidad began taking certain Rigs out of service and laying off the employees assigned to those Rigs, and began reducing the size of the crews assigned to certain Rigs that remained in service. *Id.*

11. In December of 2014 and January of 2015, 8 of the 32 employees assigned to Rig 123, including Mr. Sisney, were laid off. *Id.* at ¶ 13.

12. In January of 2015, Rig 206 was taken out of service, and the 22 employees assigned to that Rig, including Mr. Fetters, were laid off. *Id.* at ¶ 14.

13. In January of 2015, Rig 111 was taken out of service, and the 22 employees assigned to that Rig, including Mr. Walker, were laid off. *Id.* at ¶ 15.

### III. ARGUMENT AND AUTHORITIES

**A.　The summary judgment standard.**

14. To obtain a summary judgment based on its affirmative defense, Defendant must establish the essential elements of the defense. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322–23; *Allen v. Coil Tubing Servs., LLC*, 846 F.Supp.2d 678, 687 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014).

15. "Both movants and non-movants bear burdens of proof in the summary judgment process." *Crosby v. Collier*, A-10-CA-862 LY, 2011 WL 2489903, at *2 (W.D. Tex. June 21, 2011) (citing *Celotex*, 477 U.S. at 322). "The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense." *Id.* In so doing, the moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* At that point, the burden shifts to the non-moving party to "produce evidence in support of its claims or affirmative defenses ... designating specific facts showing that there is a genuine issue for trial." *Id.* The non-moving party must produce "specific facts" showing a genuine issue for trial, not mere general allegations. *Id.* (citing *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

**B.    The WARN Act and the Single Site of Employment Requirement.**

16. The WARN Act requires that an employer provide 60-days' notice to workers before a "plant closing" or a "mass layoff." 29 U.S.C. § 2102(a). The WARN Act defines a "plant closing" as the permanent or temporary shutdown of a "single site of employment" that results in an employment loss during any 30-day period for 50 or more employees, and defines a "mass layoff" as a reduction in force that results in an employment loss at a "single site of employment" during any 30-day period for at least 50 employees who comprise 1/3 of the employees at that site, or alternatively, at least 500 employees. 29 U.S.C. § 2101(a)(2) & (3)(B).

17. Because less than 50 persons were employed at each of the Rigs at which the Plaintiffs were employed, neither a "plant closing" nor a "mass layoff" occurred if each Rig is considered to be a single site of employment. Indeed, Plaintiffs' claims fail as a matter of law if they cannot show that the Rigs and/or one or more administrative offices (the "Yards") should be treated collectively as one single site of employment. There has been only 1 reported case that has addressed the WARN Act in the context of layoffs involving drilling rig crews.[1] *See Voisin v. Axxis Drilling, Inc.*, CIV.A. 15-571, 2015 WL 6438918 (E.D. La. Oct. 21, 2015). In *Voisin*, the court specifically held that geographically distinct drilling rigs and the administrative office that were owned and operated by the same employer could not be treated collectively as a single site of employment under the WARN Act. *Id.* In light of the *Voisin* decision and under the plain meaning of the statute, the regulatory guidance, and the additional body of WARN Act case law addressing employers that operate multiple locations and facilities, it is clear that the Rigs and the Yards in each of the three respective general geographic locations should **not** be treated as three single sites of employment.

C. The Meaning of "Single Site of Employment."

   *(i)   The Plain Meaning of the Statutory Language.*

18. The WARN Act "does not specifically define what constitutes a single site of employment." *Viator v. Delchamps, Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997); *Voisin*, 2015 WL 6438918, at *2. However, the phrase "single site of employment" is composed of words that have readily understood common meanings. Indeed, "single" means "consisting of one" and

---

[1] Undoubtedly, that is because drilling rigs are almost always staffed by crews of less than 50 employees; thereby making the WARN Act notice requirements inapplicable, and the argument that geographically distinct drilling rigs should be considered together as one single site of employment is rarely advanced.

"unaccompanied by others,"[2] so the plain meaning of single site of employment is one place or location where employees are employed; not a collection of multiple places or locations where employees are employed. Not surprisingly, this view is supported by the legislative history of the WARN Act. In *International Union of United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722, 726 (11th Cir. 1993), the Eleventh Circuit considered and found the legislative history of the WARN Act to be "persuasive" on this very point; explaining:

> [a]ccording to the Conference Report, the conferees removed all references to "place of employment" and replaced them with "single site of employment." Apparently, "this change is intended to clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met." *United Paperworkers Local 340 v. Specialty Paperboard, Inc.*, 999 F.2d 51, 56 (2nd Cir.1993) (citations omitted).

19. The plain meaning of the relevant language of the WARN Act leads to the conclusion that each Trinidad Rig and the Trinidad office were separate sites of employment, and that they should **not** be treated collectively as one single site of employment for purposes of Plaintiffs' claims.

### *(ii)    The DOL Regulations.*

20. Exercising its rulemaking authority, the Department of Labor ("DOL") has adopted regulations that address what constitutes a single site of employment. Those regulations are found at 20 C.F.R. § 639.3(i), and they support the conclusion that each Trinidad Rig was a separate site of employment, and should **not** be treated collectively as one single site of employment. In relevant part, the regulations provide as follows:

> (1) A single site of employment can refer to either a single or a group of contiguous locations. . .

---

[2] *Single Definition*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/single (last visited June 24, 2015).

HOU:3615374.2

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purposes, and share the same staff and equipment. . .

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. . .

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate work forces are considered separate sites of employment. . .

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

21. In *Viator*, the Fifth Circuit explained that "the DOL made clear in its analysis of its implementing regulations that '[t]he general rule is that separate facilities are separate sites,'" and "that exceptions to the general rule are 'narrow' and should be limited to cases where geographically distinct sites have an 'inextricable operational purpose.'" *Viator*, 109 F.3d at 1127 (*citing* 54 Fed. Reg. P 16,049-050 (April 21, 1989)).

**D. The Relevant Case Law.**

    *1. Drilling Rig Cases.*

22. There is one reported case that addresses whether geographically distinct drilling rigs that are owned by the same employer should be treated collectively as a single site of employment. In *Voisin*, 2015 WL 6438918, a drilling operator was sued by former employees claiming that they, and other employees, were entitled to, but did not receive, layoff notices under the WARN Act. The plaintiffs alleged that all the rigs and the drilling office were together a single site of employment. In holding that the rigs were each separate "single sites of

employment," the court noted that 1) the rigs and drilling office "were not 'used for the same purpose' . . . . the rigs were separate facilities that functioned independently of each other and the office;" 2) "each rig had its own employees;" 3) "[w]hile the rig managers and drillers communicated frequently with the operations manager at the [drilling office] . . . daily work assignments for the rig employees were delegated onboard the rig;" and 4) the drilling office and the rigs did not share equipment. *Id.* at *4–5.

23. Although *Voisin* is the only drilling rig case, other federal courts have addressed the single site of employment issue in the context of employers that operate multiple retail store locations; employers that operate multiple construction sites; employers that operate multiple coal mines; and employers that operate multiple manufacturing facilities, and those courts have concluded that geographically distinct locations should not be treated collectively as one single site of employment.

### 2. Retail Establishment Cases.

24. Numerous cases have found that retail stores that are owned and operated by the same employer are separate sites of employment; even when located in the same geographical area. For example, in *Viator*, 109 F.3d 1124, the Fifth Circuit found that three department stores that were located in Lake Charles, Louisiana, and that were owned and operated by the same employer, were each a single site of employment, and should **not** be treated collectively as one single site of employment for WARN Act purposes. After considering the DOL regulations, the Fifth Circuit said that:

> [S]eparate facilities are only to be treated as a single site of employment if all three factors identified in the regulations are met, namely: 1) the separate facilities are in "reasonable geographic proximity" of one another; 2) they are "used for the same purpose"; 3) and they "share the same staff and equipment." *20 C.F.R. § 639.3(i)(3)*. Any other reading would be inconsistent with the plain language of the regulation.

*Viator*, 109 F.3d at 1127.

25. In *Carpenters District Council v. Dillard Department Stores, Inc.,* 790 F. Supp. 663, 667–68 (E.D. La. 1992), the district court held that four different business locations (a planning department, a retail store, and two warehouses) were not a single site of employment under the WARN Act. In so concluding, the court acknowledged that all of the locations were in New Orleans, but noted that they were "several miles" apart, and that each location "had its own manager." *Id.* at 667. The Court further noted that most personnel were "assigned to a particular facility; the only exceptions being "engineers, electricians, and carpenters who were responsible for repair and maintenance" at all locations. *Id.* Finally, the Court concluded that the existence of a centralized payroll and some common personnel functions were not enough to deem the locations a single site." *Id.*

### 3. *Mining Cases.*

26. In *International Union*, 6 F.3d 722, both the district court and the Eleventh Circuit found that coal mines operated by the same employer in the same geographic area were separate sites of employment, and should not be collectively considered a single site of employment.[3] The district court granted the employer's motion for summary judgment, and the Court of Appeals affirmed; finding that no WARN Act event took place because "none of [the] four mine sites should be considered together as a 'single site of employment' under [the] WARN Act." *Id.* at 727. In reaching its conclusion, the Court of Appeals noted that the DOL's regulations "suggest that when a single employer has a series of sites that operate autonomously, those sites should not be considered a single site." *Id.* at 724. And as noted above, the Court of Appeals found the legislative history of the WARN Act to be "persuasive;" specifically that the

---

[3] In *Davis v. Signal International Texas GP, L.L.C.*, 728 F.3d 482, 487 (5th Cir. 2013), the Fifth Circuit cited favorably to the Eleventh Circuit's *International Union* decision to reject the "argument that four mines share the same operational purpose and must be considered a single site" of employment (internal quotes omitted).
HOU:3615374.2

Conference Committee replaced all references to "place of employment" with the phrase "single site of employment" so as to "clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met." *Id.* at 726.

27. The Court of Appeals rejected the plaintiff's argument that there was "a factual dispute over whether [the] separate mines are independent" because, *inter alia*, some of the mines "are geographically contiguous, and the employer's 'Central Mining Office exercises significant control and authority at each mine site over the provision of supplies and equipment, the negotiation of collective bargaining agreements, the initiation of safety programs, and the decisions to lay-off employees.'" *Id.* at 725. The Court of Appeals said that such facts "do not demonstrate that the mines should be considered a single site." *Id.* With respect to the fact that "the Central Mining Office had *de facto* operational control of all four mine sites," the district court and the Court of Appeals both noted that "each mine has its own complement of employees and that each mine's management team has real organizational and operational responsibility for its respective mines." *Id*. They further said that the Plaintiff's argument was an "attempt to blur the distinction between a single site and a single employer," and that the regulations "distinguish between a single site and a single employer by stating that 'an employer may have one or more sites of employment under common ownership or control.'" *Id.* (citing 29 C.F.R. § 639.3(a)).

### 4. Construction Case.

28. In *Bader v. Northern Line Layers, Inc.*, 503 F.3d 813, 819–20 (9th Cir. 2007), the court concluded that the "site of employment" for each construction employee was not the employer's office/headquarters, but, rather, was, the actual construction work site at which each employee worked. The court based this conclusion on the fact that the employees working at the construction sites did not physically report to the office/headquarters during a typical work

period and did not receive daily work assignments from the office/headquarters. *Id.* at 820–21. Moreover, day-to-day management of these employees occurred at the construction site. *Id.* at 820. Because no single construction site had more than 50 employees working there, no notice under the WARN Act was required. *Id.* at 822.

### 5. *Manufacturing Cases.*

29. In *Salyer v. Universal Concrete Products*, 940 F.2d 662 (6th Cir. 1991) (per curiam), the court held that a concrete plant and a concrete bridge beam plant, located approximately sixty feet apart and owned and operated by the same employer, did not constitute a single site of employment. The court reached its conclusion that the two plants did not meet the definition of "single site of employment" based upon an affidavit from the defendant stating that the two plants "were under separate management, produced different products, and had separate workforces" and found that the plaintiffs had failed to produce evidence to dispute the statements in the affidavit. *Id.*

30. In *McClain v. Laurel St. Art Club, Inc.*, 925 F. Supp. 496. 497–98 (E.D. Ky. 1995), *aff'd,* 106 F.3d 401 (6th Cir. 1997), the 2 manufacturing and shipping facilities were located 15 miles apart and shared the same upper level management, computer network, accounting department, and telephone switchboard. The court held that the facilities were not a single site of employment, however, because only 6 to 8 out of the 40 shipping facility employees worked at the manufacturing facility when needed, and there was no other sharing of employees and no sharing of equipment between the two facilities. *Id.* at 499. Moreover, the day-to-day operations of each facility were managed by separate managers. *Id.* In the opinion, the court held that the WARN Act "is to be narrowly construed in favor of finding separate sites of employment where there is geographical separation." *Id.* at 498–99.

31. In *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir. 1994), the Fifth Circuit held that two non-contiguous manufacturing plants did not constitute a single site of employment. As part of its holding the court cited 20 C.F.R. § 639.3(i), stating that the two plants could not constitute a single site of employment because "employees were not rotated between the two different sites, and the locations did not share staff and equipment." *Id.*

32. In *Fuentes v. Houston Indus. Inc.*, CIV. A. H-92-2728, 1994 WL 776692, at *4 (S.D. Tex. Mar. 31, 1994), the court viewed the defendant's 48 electricity production and distribution sites as analogous to the "assembly plants" used as an example of non-contiguous sites in the text of the WARN Act. *Id.* (citing 54 Fed.Reg. 16066). In the opinion, the court stated that the "key determination" was whether the non-contiguous sites "employ separate workers." *Id.* The plaintiffs' submitted evidence showing that the defendant had only one human resources department and centralized hiring procedures, and that "employees were frequently required travel [sic] between job locations." *Id.* The court held that such evidence "does not prove that the various sites dispersed over 500 square miles do not 'employ different workers' as that concept is contained in 20 C.F.R. § 639(i)(4)" and that such evidence "proves only that the various sites are "managed by a single employer." *Id.* The court also noted that, for the workers who traveled between job sites, their site of employment is the site "from which their work is assigned, or to which they report." *Id.* at *5 (citing 20 C.F.R. § 639.3(i)(6)).

33. In *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1279 (8th Cir. 1996), the two manufacturing sites were 11 1/2 miles apart. The court held that plaintiffs' evidence of the "occasional transfer of employees and office equipment between different sites" did not raise a genuine issue of material fact as to the necessary connection between locations to constitute a

single site of employment. *Id.* at 1281. The court went on to state that the evidence must show that "employees and equipment are regularly shared." *Id.*

34. In *Frymire v. Ampex Corp.*, 61 F.3d 757, 765–66 (10th Cir. 1995), the court held that two manufacturing plants were not a single site of employment where the plants were 150 feet apart and were owned by the same parent corporation, though each plant was operated by different corporate subsidiaries. The court noted in its opinion that, even though there was "some overlap and coordination of otherwise distinct managerial responsibilities" especially with regard to human resources and training, "the two corporate subsidiaries were, by and large, separately managed." *Id.* at 766. Notably, the plaintiff had contended that "employees freely transferred between the two buildings without any loss of seniority or benefits." *Id.* at 767. The court responded by stating that "even assuming transfers did occur frequently, we certainly cannot equate this phenomenon with the 'shifting,' 'rotating' or even 'sharing' of employees that presumably defines a non-'separate' workforce." *Id.* (citing 20 C.F.R. §§ 639.39(i)(3)).

### 6. Other Cases.

35. In *Schexnadyre v. Aries Marine Corp.*, 06-0987, 2009 U.S. Dist. LEXIS 6432 (W.D. La. January, 29, 2009), the district court considered a FMLA claim that turned upon defining the "worksite" of members of a boat crew. After determining that there were no published opinions discussing the definition of "worksite" under the FMLA, the district court determined that Congress intended worksite to have the same meaning as single site of employment under the WARN Act, and turned for guidance to case law interpreting the application of the WARN Act to employees having no "fixed worksite." *Id.* at *8–9. In a thorough and well-reasoned opinion, the Court noted that "plaintiff's 'worksite' will be either his home base, the place from which his work was assigned, or the place to which he reported." *Id.* at *9.

36. In *Bledsoe v. Emery Worldwide Airlines, Inc.*, 3:02CV069, 2008 WL 9020541, at *9 (S.D. Ohio Mar. 24, 2008), the court held that 3 commercial air freight carrier facilities, a hangar, a hub, and a training facility were not a single site of employment. The hangar was located one half-mile from the hub and the training facility was located approximately 8 miles from the hub and hangar. *Id.* at *8. Though the 3 facilities had "integrated operations" in that they were "important links in the chain of [the carrier's] operation," the facilities were not a single site of employment because there was no "regular practice of sharing equipment or employees." *Id.* at *9.

E. **Conclusion: Trinidad's Rigs Are Not, Collectively, a "Single Site of Employment."**

37. Plaintiffs can only satisfy the statutory requirements to trigger the WARN Act if the employees assigned to the various Rigs are aggregated. Specifically, Plaintiffs attempt to aggregate Trinidad employees assigned to various Rigs located in three general geographic areas surrounding Trinidad's Yards in 1) San Antonio, Texas; 2) Woodward, Oklahoma; and 3) North Central Texas. In reality, these employees were employed at specific Rigs that were located at geographically distinct drilling sites and that had different managers for day-to-day operations with no regular practice of sharing employees or equipment between the Rigs or the Yards. *See* Exhibit A. Therefore, under the forgoing precedent, each Trinidad Rig is a separate and distinct "single site of employment" from every other Rig and the Yards, and no WARN Act notices were required because there was no single site of employment where at least 50 employees were laid off. Accordingly, Trinidad is entitled to summary judgment on Plaintiffs' claims.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Defendant Trinidad Drilling, LP prays that Plaintiffs take nothing by their claims and respectfully requests that this Court dismiss Plaintiffs' claims against Defendant with prejudice for the reasons set forth herein.

Respectfully submitted,

ANDREWS KURTH LLP


By: /s/ *J. Marshall Horton*
    Matthew L. Hoeg (Attorney In Charge)
    State Bar No. 09772880
    J. Marshall Horton
    State Bar No. 24029095
    Paul M. Davis
    State Bar No. 24078401
    600 Travis, Suite 4200
    Houston, Texas 77002
    713.220.4024    Direct
    713.238.5002    Direct Facsimile
    mhoeg@andrewskurth.com
    marshallhorton@andrewskurth.com
    pauldavis@andrewskurth.com

ATTORNEYS FOR DEFENDANT
TRINIDAD DRILLING, LP


## **CERTIFICATE OF SERVICE**

    I hereby certify that on February 10, 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Western District of Texas, by using the CM/ECF system, and that service will be accomplished by the CM/ECF system to the following counsel for Plaintiffs:

Allen R. Vaught
Melinda Arbuckle
Baron & Budd, P.C.
3102 Oak Law Ave., Suite 1100
Dallas, Texas 75219

    /s/ *J. Marshall Horton*
    J. Marshall Horton

Page 16 of 16
HOU:3615374.2